IRA GREGORY AND ANOTHER *vs*. WILLIAM SAVAGE AND ANOTHER.

*M* sold and conveyed to *P* a piece of land, which *P* mortgaged back to *M* to secure sundry negotiable notes given for the price. Before these notes were due *M* negotiated them and assigned the mortgage to *B*, who afterwards indorsed one of the notes to *G*. Afterwards, and before the note held by *G* had matured, *P* gave up the purchase of the land and quitclaimed it to *M* the mortgagee, the deed being put on record. *M* afterwards, and before the note in question became due, conveyed the land to *S* for a valuable consideration, informing him at the time, in reply to his inquiries as to the state of the title, that the sale to *P* had been given up and he had released him from his obligations and taken back the property ; and *S* examined the records and saw the record of the quitclaim there *S* enquired no further, and had no knowledge or suspicion that any of the notes had been negotiated or were outstanding. Both *P* and *M* became insolvent and the note held by *G* was never paid. On a bill for a foreclosure brought by *G* against *S*, it was held that, in the absence

of suspicious circumstances, and with the title clear upon the public records, *S* was not bound to inquire after the notes given by *P*, but had acquired a valid title to the property against *G*.

And held that it made no difference that the notes were negotiable.

Also that if *S* was bound to make inquiry, it was very questionable whether he was bound to make further inquiry than he in fact did of *M*.

BILL for a foreclosure. The bill alleged that on the 27th of May, 1858, John R. Parker made his promissory note of that date, by which he promised to pay, three years after date, to Giles Mandeville or order, three hundred dollars with interest, for value received, and delivered it to Mandeville, and on the same day, to secure the payment of that note with others, made and delivered to Mandeville a mortgage of a piece of land situated in Hartford, of which he was seized in fee simple, [describing it,] which mortgage was on the 19th day of July, 1858, duly recorded in the records of lands of the town of Hartford, and of which the condition was as follows :—" The condition of this deed is such, that whereas I am justly indebted to said Mandeville by my five promissory notes of even date herewith, each for the sum of three hundred dollars, payable to said Mandeville or order, in one, two, three, four and five years after date respectively, with annual interest,— now should I well and truly pay or cause to be paid the sums that shall be due upon said several notes according to the tenor thereof, then this deed is to be null and void, else to be and remain in full force and virtue in law ; " that the mortgage and all of the notes were, on the 14th day of August, 1858, assigned and transferred by Mandeville to one Henry G. Brigham, and that about the 16th of the same month of August, Brigham transferred to the petitioners the promissory note first above described payable in three years after date, and also the one payable two years after date, for a full and valuable consideration paid by the petitioners ; that the note payable in two years had been paid, but that the other payable three years after date had not been paid nor any part thereof, and that the same ever since the transfer to them had been and still was the property of the petitioners, and that there was due thereon the sum of more than three hundred and

twenty dollars; that the petitioners were informed and believed that the note payable in one year after date had been paid, and that the same was no longer a lien upon the premises, and that the two notes described as payable in four and five years after date were still outstanding and unpaid, but that they were not in the hands of the petitioners; that they were informed and believed that Parker quitclaimed his interest in the real estate to Mandeville, on or about the 14th of December, 1858, and that the deed was on or about the same day recorded in the records of lands of the town of Hartford; that on or about the 3d of February, 1859, Mandeville conveyed the same real estate to William Savage, of Hartford, and that on the same day Savage mortgaged it to the state of Connecticut to secure the payment of the sum of $1,500 for the benefit of the school fund of the state; that the deed to Savage and mortgage to the state of Connecticut were, on or about the same day, recorded in the records of lands of the town of Hartford; that the quitclaim from Parker to Mandeville, and the conveyance by Mandeville to Savage, and the mortgage from Savage to the state of Connecticut, were all of them subsequent to, and subject to the rights of the petitioners; that the premises were forfeited at law and had become the absolute estate of the petitioners, subject to the right of Savage and the state of Connecticut to redeem the same by paying to the petitioners the amount due on the note so held by them; that the premises were worth the sum of twenty-five hundred dollars and no more; and that they asked for no decree affecting the rights of any bona fide holder, if any such there might be, of either of the notes payable subsequently to the note now held by the petitioners. The petitioners therefore prayed the court to inquire into the allegations of the bill, and on finding them true to decree that unless Savage and the state of Connecticut should redeem the premises by a time to be fixed by the court they be forever foreclosed of all right to redeem the premises.

The respondents filed the following answer:—

That it is true that Parker made his promissory notes and mortgage to Mandeville in the manner described in the peti-

tion, and that Parker was then the owner of the premises, and that the notes were assigned to Brigham ; and they admit that said Brigham transferred to the petitioners two of the notes, and that one of the latter has been paid, and the other remains unpaid in the hands of the petitioners, and belonging to them, and that the amount due thereon is as stated in the petition, and that the note described as due one year from date has been paid, and that the notes described as payable respectively four and five years after date are outstanding and unpaid, but not in the hands of the petitioners ; that it is true that Parker quitclaimed his interest in the real estate mortgaged to Mandeville, on the 14th of December, 1858, and that on the 3d of February, 1859, Mandeville conveyed it to the respondent Savage, who, on the same day mortgaged it to the state of Connecticut, as stated in the petition, and that all the deeds were duly recorded and that the premises are of the value stated in the petition, and that Parker has been a resident of Hartford as stated in the petition, although the respondents did not then know him, or any thing with regard to his residence, nor did they make any inquiries in regard to the same ; that on the same day on which Parker mortgaged the premises to Mandeville, and immediately before, Mandeville being then the owner of the premises sold the same to Parker, subject to an existing mortgage for $1,500 to the state of Connecticut, which Parker assumed to pay, and that the five notes described in the mortgage were given as part of the consideration to be paid by Parker ; that on the 14th of December, 1858, at the time of the release of his interest in the premises to Mandeville by Parker, Parker was insolvent and unable to pay the notes, having no property except the premises, which were incumbered by the prior mortgage to the state and by the mortgage to Mandeville to their full value ; and that the release was made as the result of the agreement between Mandeville and Parker that the former should take back the premises and release him from all further payments or liability for the purchase, and that Mandeville agreed to provide for the notes which had previously been transferred by him, and save Parker harmless therefrom ; that the respondent Savage had

no knowledge of the fact that the notes or any of them were outstanding at the time of the conveyance of the premises to him by Mandeville, and that at the time of the conveyance he inquired of Mandeville if the premises were free from incumbrance, and was assured by him that they were, and that Mandeville then informed him that Parker was unable to perform his undertakings for the payment for the premises and he, Mandeville, had released him from his obligations and taken back the property ; that nothing was said by Mandeville further than this, as to whether the notes had been taken up by Parker or were outstanding, nor did the respondent Savage inquire any more specially about them than as above stated, nor did it occur to him to make any more particular inquiries, but he had not at the time the slightest suspicion that they were outstanding and verily believed that the premises were entirely free of all incumbrance whatsoever ; that at the time of purchasing the premises from Mandeville he examined the records and saw the record of the quitclaim deed from Parker to Mandeville, and found, as he supposed and verily believed by the records, that the title to the premises was clear in Mandeville ; and thereupon, and relying on the records and his representations, the respondent Savage paid Mandeville the full value of the land and received from him a deed of conveyance with the usual covenants of seizin and warranty ; that both Mandeville and Parker are and have been for more than two years past, and ever since the respondents were informed that the notes were outstanding, utterly insolvent ; that on the day of the conveyance to him by Mandeville, the state of Connecticut quitclaimed the prior mortgage of fifteen hundred dollars and took a new mortgage of the same premises for the same sum from the respondent Savage, which is the mortgage referred to in the petition, and at the time of taking the last mortgage and at the time of releasing the former one the proper agents of the state examined the records of the town of Hartford, and relying thereon released the former mortgage made to the state and took the present one from the respondent ; and thereupon they say that the

petitioners' bill ought to be dismissed and they take nothing thereby.

The court found the allegations of fact in both the bill and answer to be true, and reserved the case for the advice of this court.

*Carter*, for the petitioners.

Parker executed the mortgage in question to Mandeville to secure five promissory notes of $300 each. Mandeville soon after assigned all these notes, with the mortgage, to Brigham, there being no record conveyance of the mortgaged premises. Brigham the next day transferred two of the notes to the petitioners. One of these has been paid ; the other is now due and unpaid, and is the one on which the present suit is brought. Parker quitclaimed the equity of redemption to Mandeville, who had all the time held the mortgage title. Mandeville then conveyed the land to Savage, the principal respondent, who afterwards mortgaged it to the state of Connecticut. Savage now claims that he took a clear title from Mandeville, because the title was clear upon the public records. We contend that he took it subject to our mortgage interest.

1. We were bona fide holders of the notes. We took them before due, and for value, and at the time the mortgage lien in their favor was complete.

2. The transfer of the notes to us drew the security after them. The debt is always the principal thing and the security the accessory. 4 Kent Com., 193.

3. The notes were negotiable, and were obviously made so for the purpose of being negotiated. The record disclosed this fact, and that the notes had not matured, and this was enough to put Savage on inquiry. *Boswell* v. *Goodwin*, 31 Conn., 83.

4. A purchaser who has sufficient information to put him upon inquiry, is considered in equity as having notice, and in such case he will not be considered as a bona fide purchaser. *Pendleton* v. *Fay*, 2 Paige, 202, 205.

5. If it was the duty of Savage to make inquiry it is clear

that he made no inquiry that should shield him from the consequences of his neglect.

6. The legal and equitable titles did not become merged in Mandeville. A court of equity will keep them distinct, when it can see that the equitable rights of the parties require it. *Mallory* v. *Hitchcock*, 29 Conn., 127.

*H. H. Barbour*, for the respondents.

The respondents had no notice of the assignment of the notes and mortgage. Can they be affected by the petitioners' equity? The petitioners claim that the respondents were put upon inquiry by the record of the mortgage, showing that several negotiable notes not due might be held by assignees, with an equitable claim under the mortgage. Of whom should they inquire? Of the mortgagee and payee of the notes? He forestalled such inquiry by the representations in his deed; he could not do more than make a statement that he was lawfully seized of the premises free from incumbrance—he could not prove it by the production of the notes, if paid, for they would not be in his hands. Could they be required to hunt up the mortgagor? Could he be found, or if found be compelled to answer truly? If there was fraudulent collusion between the mortgagor and mortgagee how could the respondents detect or be responsible for it? The respondents were justified in supposing that the mortgagor had taken up his notes before he discharged the mortgage. Should they have inquired of every body within a circle of one hundred miles around Hartford? How were they to ascertain the facts now set up? The respondents claim the following legal principles to be applicable to the case.

1. If the mortgagor quitclaims his equity of redemption to the mortgagee, the latter becomes the absolute owner of the estate. *Harrison* v. *Phillips Academy*, 12 Mass., 456. Mandeville was the absolute owner of the land conveyed to Savage, free of all lien or incumbrance, so far as the records gave notice.

2. The object and policy of our registry laws are to give notice of the state of the title of real property; and purchas-

ers may safely rely on what appears by the records, and will be protected in acting accordingly, unless guilty of fraud, actual or constructive. *Wheaton* v. *Dyer*, 15 Conn., 311; 1 Story Eq. Jur., §§ 397, 398; *Ledyard* v. *Butler*, 9 Paige, 136; *Jackson* v. *How*, 19 Johns., 83.

3. Bona fide purchasers of land are not affected by outstanding secret equities or trusts without notice, and in order to subject them to equitable claims not disclosed by the registry, actual notice must be alleged and proved. *Sumner* v. *Rhodes*, 14 Conn., 139; *Cutler* v. *Haven*, 8 Pick., 490; *Jackson* v. *Blodget*, 5 Cowen, 202.

4. Implied notice, and information which imposes the duty of further inquiry, must be clear and undoubted; that which is calculated to excite mere suspicion is not sufficient if the records show a clear title. Reasonable vigilance and diligence only are required of the purchaser. 1 Story Eq. Jur., §§ 399, 400, 400 *a*, 403; *Hine* v. *Dodd*, 2 Atk., 275; *Jolland* v. *Stainbridge*, 3 Vesey Jr., 478; *M'Mechan* v. *Griffing*, 3 Pick., 149; *Newhall* v. *Pierce*, 5 id, 450; *Newhall* v. *Burt*, 7 id., 156; *Jackson* v. *Van Valkenburgh*, 8 Cowen, 260; *Day* v. *Dunham*, 2 Johns. Ch., 182; *Fort* v. *Burch*, 6 Barb., 60; *Peters* v. *Goodrich*, 3 Conn., 150.

5. If the doctrine contended for by the petitioners is sustained, that a subsequent purchaser is bound to know that negotiable notes secured by a prior mortgage have been paid, and may not rely upon a discharge by the mortgagee duly recorded, it will apply as well to mortgages of long standing, (less than twenty years,) as to this case, and will render operations in real estate very hazardous, in most cases to those who engage in them as purchasers or mortgagees; for ordinarily the only evidence of the payment of the debt secured by mortgage which can be obtained is the representation of the mortgagor and mortgagee, and they are not always accessible; and according to this doctrine their statements, if false, will not protect the subsequent purchaser or incumbrancer against the claim of an assignee of a negotiable mortgage note.

6. The assignee of a mortgage debt may require a regular

deed of conveyance of the mortgagee's interest in the land, and have the same recorded, and thereby secure his rights as against subsequent purchasers claiming under a fraudulent discharge of the mortgage ; or he may procure an injunction against the discharge of the mortgage by the mortgagee ; and if he fails to secure his rights by such measures, a court of equity will not aid in enforcing his lien as against a subsequent purchaser or incumbrancer who has taken a deed or mortgage relying upon a clear record of title. It would be in violation of the fundamental principles of equity jurisprudence to sustain a secret equity under such circumstances.

HINMAN, C. J. This is a bill for the foreclosure of mortgaged premises. The petitioners are bona fide holders of a note originally secured by the mortgage in question, and the respondent Savage is the bona fide purchaser of the mortgaged property, and the state of Connecticut, which is also made a respondent, is the mortgagee of Savage. Neither of the respondents had any notice that the property was incumbered at the time of taking their conveyances, and the title appeared by the land records to be in Mandeville, from whom the respondent Savage purchased. Thus far the equities of the parties would seem to be balanced. The note, with other notes made at the same time, was executed by John R. Parker for the purchase money of the mortgaged property ; they were payable to Mandeville or order, he being the person of whom this purchase was made ; and the mortgage in question was executed by Parker to him to secure their payment. Shortly after this transaction Mandeville transferred the notes with the mortgage to one Brigham, who subsequently transferred the note now held by the petitioners to them. There was no assignment by deed of any interest in the mortgaged property, either to Brigham or the petitioners, and an examination of the land records, therefore, would have furnished no information on the subject of their being holders of the notes, or having any interest in the mortgaged property. After Mandeville had parted with the notes, Parker, in December, 1858, quitclaimed his equity of redemption to him, and in the

February following he, Mandeville, sold and conveyed the property to Savage, and Savage mortgaged it to the state.

The regular record title is therefore in the respondents, and they, through the respondent Savage, as we suppose, are in possession. On this short view of the case it would seem that the well established equitable principle, that where the equities are balanced the title at law will prevail, would determine the case in the respondents' favor. But it is claimed that the equities are not equal, because, it is said, the respondent Savage, at the time of his purchase, could have discovered by the record that the property had been mortgaged to secure certain negotiable notes which were not yet due, and might therefore be presumed to be outstanding in the hands of some one, and that it was his duty to protect himself by inquiry before he took his conveyance, and it was laches in him not to inquire. Savage it would seem did know that Mandeville had formerly sold the same property to Parker, and probably knew that Parker had mortgaged it back to secure the purchase money, and this appeared by the record. It is clear, therefore, that the person most likely to know what had become of the notes was Mandeville, and it appears from the answer, which is admitted to be true, that Savage did inquire of him if the premises were clear from incumbrance, and Mandeville informed him that they were, and he also informed him that Parker was unable to perform his undertaking for the payment for the premises, and that therefore he had taken back the property and released him from his obligations. In substance this was informing Savage that the notes had been given up or canceled, since in no other mode could they be effectually released so as to prevent their transfer to a bona fide holder. Now if Mandeville meant to mislead Savage by giving him this information in such a form as to be literally true, and yet to convey a false impression that Parker's notes were no longer in existence, and he suppressed the fact that the notes had then been negotiated to bona fide holders for value, it shows, we think, that any further examination of him would probably have elicited very little additional information. If Savage was bound therefore to make reasonable inquiry as to whether

these notes were then outstanding in the hands of third persons, we should be strongly inclined to hold that he did make all the inquiry that under the circumstances ought to be required of him. So far as he could know, there was no one who could give him any further information on the subject, and when informed that the property was free from incumbrance, and the undertakings of Parker for the payment for it had been released, he had a right to rely upon the information as given in good faith and correct in fact.

But we by no means intend to be understood as holding that he was bound to make the inquiry that it appears he did make. The record title to the property appeared to be in his grantor, Mandeville. He too was the only person at all likely to know whether there was any incumbrance that did not appear upon the record. If he would convey property that he knew was incumbered by a mortgage without disclosing the fact to his grantee, he would not probably be a very reliable person of whom to inquire whether in so doing he was committing a fraud ; and such an inquiry could hardly be required or expected to be made if the grantor was in fact incapable of such an act. We think therefore Savage was justified in relying upon the record, and upon the assurances made to him in his deed, which ought to be as reliable as any parol assurances that could be given. Besides, in disposing of this question of laches, for the purpose of discovering who has the strongest equity, we are inclined to think that the omission of Brigham and of the petitioners at the time the notes were transferred to them respectively, to take deeds of assignment of the mortgaged property, was as great laches, to say the least, as the negligence of Savage in not making inquiry. They could have protected their interests by deeds which would have placed it beyond the power of Mandeville to commit a fraud, and if they relied at all upon the mortgage security we think their only safe course was to do so. Whether the petitioners relied at all upon the mortgage does not appear, or even that they knew of its existence at the time the notes were assigned to them. They might have relied entirely upon the personal security of the parties to the

notes, and the attempt now to avail themselves of the mortgage may be an afterthought; and if so, their equities are obviously inferior to those of the respondents.

The negotiability of the notes has been somewhat relied upon as making the petitioners' case stronger than it would otherwise be, but we think this circumstance does not vary the equities of the case. All choses in action are assignable in equity, and the assignee's rights will be protected to such securities, as well as to such as are negotiable at law. We think then that the respondents' case may fairly rest upon the equitable maxim that where there is equal equity the law will prevail. This is the ground upon which courts ordinarily refuse to interfere against a bona fide purchaser, for a valuable consideration, of a legal estate, without notice of any adverse claim or incumbrance, and this maxim is, in cases of this sort, entitled to peculiar force with us under a recording system founded upon the policy of having the true state of every title to real estate appear upon our records. This policy, remarks Williams, C. J., in *North* v. *Belden,* 13 Conn., 380, " has added greatly to the security of our land titles and has prevented much litigation which would otherwise have arisen ; and our courts have ever considered it their duty to give such a construction to our statutes as will continue this salutary protection." The petitioners' claim is the creature of equity. The assignment to them of the notes was in equity a transfer to them of the mortgage given to secure them. But if they had at the time taken a new mortgage to themselves directly to secure the notes, it would have been utterly useless as a security unless they had caused it to be recorded ; and is it so that a mere equitable transfer, not evidenced by any writing whatever, and of which the land records give no notice, is to have an operation which would not be given to a regularly executed deed ? This court, in *Orvis* v. *Newell,* 17 Conn., 97, held that an intervening incumbrance, implied by equity, but of which a subsequent mortgagee had no notice, was of no validity against such mortgagee, and yet the equitable claim in that case appears to have been as strong as that of the petitioners in this. The case of *The Quinebaug Bank* v. *French,*

17 Conn., 129, is also a strong authority in support of the views here expressed. In that case there was an assignment under the hand and seal of the mortgagee on the back of the mortgage deed. The express intention was therefore to uphold it as a continuing security, and there was no intention by any one that it should be given up or abandoned. And yet it was held, in consequence of a quitclaim deed executed at the same time to the mortgagor, and a warranty deed from him to the assignee, that the mortgage was discharged so far as the rights of an attaching creditor were concerned ; and the case was distinguished from that of *Baldwin* v. *Norton*, 2 Conn., 161, which was much relied on by the respondent. " A release deed," says Williams, C. J., in that case, (p. 136,) " is the ordinary evidence in this state that the mortgage debt is paid, or the security given up, and, when recorded, it was a declaration to all the world of that fact, and that the public might safely deal with the mortgagor as if no mortgage had been given ; and were we to hold that those who trusted to such record evidence were not safe, vain would be our registry laws, and vain would be further attempts to enforce them." And again, it is said in that case, that " the court proceeds upon the simple ground that the record speaks a language that can not be misunderstood, and shows beyond a doubt that so far as the record speaks the mortgage has ceased to exist." Again, it is familiar law that a sale of real estate by a trustee to a bona fide purchaser, who has no notice of the trust, if made for a valuable consideration, will be good against the rights of the *cestui que trust*. Now after the assignment of the notes by the mortgagee, Mandeville, to Brigham, without any assignment of the mortgage title by deed, Mandeville became a trustee of this title for the benefit of Brigham and his assignees. And he continued to be such trustee, as between himself and the assignees of the notes, as well after he took his release deed from Parker as before. But having united in himself both this mortgage title and the outstanding equity of redemption, so as to appear to be the absolute owner in fee of the land, it is not easy to see why, upon this principle, a bona fide purchaser from him, without any notice or knowledge of

any secret lien or mortgage in any one, should not be protected in his purchase, rather than that the estate should be transferred to a class of assignees, who, however just may have been their claims as between themselves and their assignors, had still omitted to obtain the ordinary and usual evidence of having an interest in land, by omitting to obtain the legal title to the mortgaged premises and causing it to be spread upon the records.

The advantage which the holder of the legal title obtains against others having the same equitable interest is very well illustrated by the case of *Osgood* v. *The Thompson Bank*, 30 Conn., 27. In that case there were several notes secured by the same conveyance of the legal title to land, and these notes were subsequently assigned to different persons, with an assurance to each assignee, made at the time of each assignment, that the note assigned was so secured ; still, this court held that one of these assignees, having procured a conveyance of this legal title to himself and having no notice at the time of the other notes similarly secured, was authorized to hold the land or the avails of it as a security for the payment in full of his note, to the exclusion of the others having claims secured by the same conveyance. There is also a case in 22d Texas Rep., 464, which seems to be almost identical with the case under consideration. It is the case of *Henderson* v. *Pilgrim*, in which it was held that under their statute an assignment of a mortgage should be recorded as an agreement relating to land, and, if it was recorded, a bona fide purchaser of the mortgagor, who at the time receives a release and discharge from the mortgagee, holds clear of the mortgage notwithstanding a previous assignment of which he had no notice ; and the case is put upon the ground that the assignee of the debt and mortgage has but an equitable estate that can not be preferred to that of the releasee without notice. And why should it not be so ? The assignee of the debt, by omitting to take a conveyance of the land and causing it to be recorded, has put it in the power of the original parties to the mortgage, by uniting the mortgage title with the equity of redemption, to commit a fraud upon an innocent purchaser. And of the two innocent parties, one of whom must suffer, it would seem

to work the less injustice that the loss should fall upon him who by his omission to perfect his assignment has left it in the power of others to commit the fraud. It is true that in equity the union of the legal and equitable interests in the mortgagee does not always operate as a merger of the estates. But as a general rule such is the operation of this union, and it must be made to appear that the party has some beneficial interest in keeping the estates distinct in order to prevent a merger. *Lockwood* v. *Sturdevant*, 6 Conn., 374. Such being the general rule, and the cases where it has not been applied being but exceptions to it, the presumption of course is, that the general rule is applicable where no equitable circumstances which ought to prevent it are known to exist. May not a bona fide purchaser act upon this presumption? In *Bassett* v. *Mason*, 18 Conn., 131, this principle was acted upon, and controlled the decision of the case. It was there held that by the union of the estates of the mortgagor and the mortgagee in the mortgagee, the mortgage debt was satisfied and cancelled. And it was said in that case that as a general rule such union operates as a satisfaction of the mortgage. If such is the general rule, then the presumption must be in such cases that the land was taken in satisfaction of the debt, and this presumption in the case under consideration was strengthened by the assurance of Mandeville that he had taken back the property because the former purchaser, Parker, was unable to perform his undertakings, that is, was unable to pay the notes, one of which is the one now attempted to be enforced as an incumbrance upon this property, and therefore he had released him from those undertakings and had taken back the property. Under such circumstances, to require of a purchaser that he should, before trusting to such appearances thus confirmed, look up the maker of the notes in order to inquire of him what had become of them, would be to require a degree of diligence on the part of the purchaser which we think would seldom be practiced. Had he been inquired of he could only have said that, although he had not considered it important enough to take back his notes, he had still given up his purchase, and released his equity of redemp-

tion in satisfaction of the notes; and this would have brought the inquiry back to Mandeville, who, as we have seen, did inform the purchaser in substance that the notes were extinguished. If, as Judge Church remarks in *Bassett* v. *Mason*, the general rule is that the union of the mortgagor's title with that of the mortgagee operates as a satisfaction of the debt, then, as has been already said, the presumption must be that the debt is paid or satisfied in some way. And may not a party always act safely upon a legal presumption, unless there is something in the circumstances of the particular case to raise a suspicion that in that instance the presumption was not true in fact? There were no such suspicious circumstances in this case, and we are therefore satisfied that the petitioners' bill ought not· to be granted; and so we advise the superior court.

In this opinion the other judges concurred.